UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ROBERT W. FEELEY and**
**MARY D. FEELEY,**                             Chapter 7
    Debtors                                          Case No. 06-13582-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DONALD R. LASSMAN, CHAPTER 7**
**TRUSTEE,**
    Plaintiff
v.                                              Adv. P. No. 07-1201

**JOHN J. REILLY, JR., MICHAEL T. HULL,**
**AFFORDABLE FUNDING MORTGAGE**
**CORP., RICHARD COSTA, and**
**RAYMOND KOHLMAN,**
    Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~

MEMORANDUM

**I. INTRODUCTION**

The matter before the Court is the First Amended Complaint (the "Complaint") filed by Donald R. Lassman (the "Trustee") against John J. Reilly, Jr. ("Reilly"), Michael T. Hull ("Hull"), Affordable Funding Mortgage Corp. ("Affordable Funding"), Richard Costa ("Costa"), and Raymond Kohlman ("Kohlman"). The Court entered a default against

1

Affordable Funding on December 17, 2007 and a default against Hull on January 26, 2010 as Hull failed to appear and defend himself at trial.  On November 24, 2008, the Court granted the Trustee's Motion for Order of Dismissal with respect to his claims against Raymond Kohlman.  Accordingly, two defendants remain against whom the Trustee seeks the following relief arising out of a so-called "foreclosure rescue" transaction: Count I: Avoidance of Transfer - 11 U.S.C. §§ 548, 550; Count II: Avoidance of Transfer - Mass. Gen. Laws ch. 109A, and 11 U.S.C. §§ 544 and 550; Count III: Fraud; and Count IV: Violations of Mass. Gen. Laws ch. 93A.  Through his first two causes of action, the Trustee seeks relief against Reilly.  Through his last two causes of action, the Trustee seeks relief against Reilly and Costa.

The Court conducted a trial on January 26, 2010 at which Robert W. Feeley (the "Debtor" or "Mr. Feeley") (together with Mary D. Feeley, the "Debtors") testified, as well as Reilly, Costa, and the Trustee.  Five exhibits were introduced into evidence.  The issues presented include whether the Trustee satisfied his burden of proof as to the avoidability of the transfer of the Debtors' property located at 174 Warren Avenue, Seekonk, Massachusetts (the "property") to Reilly under either state or federal law, and whether he satisfied his burden of proof with respect to fraud and unfair and deceptive practice under ch. 93A as to both defendants.

The Court now makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## II. FACTS

The Debtors filed a voluntary Chapter 7 petition on October 6, 2006. Hull, a former attorney who held himself out as a paralegal employed by Kohlman and who is suspended from the practice of law in the Commonwealth, assisted the Debtors in preparing and filing their Chapter 7 petition. On November 13, 2006, the Debtors filed schedules, a statement of financial affairs and other required documents. The Debtors' schedules, which were introduced into evidence, revealed that, at the commencement of their case, they owned no real estate and had no debt secured by real estate. The Debtors did list a claim secured by a 2000 Dodge van, as well as tax debt of $57,000[1] and unsecured debt totaling $61,386.11. On Schedule I - Current Income of Individual Debtor(s), the Debtors revealed that Mr. Feeley is self-employed as a manufacturers' representative in the equine products industry, that his income fluctuates seasonally, and that Mrs. Feeley is employed and also receives a pension from Delta Airlines. On Schedule J-Current Expenditures of Individual Debtor(s), the Debtors listed their rent at $1,300 per month.

The Debtors attended the meeting of creditors held pursuant to 11 U.S.C. § 341(a). Following the meeting, Mr. Feeley contacted the Trustee and met with him to provide further disclosures about the couple's financial circumstances. As a result of that meeting, the Trustee engaged special counsel, who, on May 16, 2007, commenced the litigation now

---

[1] The Court takes judicial notice that the Massachusetts Department of Revenue filed an unsecured priority claim in the sum of $3,374.01 and that the Internal Revenue Service filed an unsecured nonpriority claim in the sum of $10,782.25 and an unsecured priority claim in the sum of $71,009.84.

before the Court on behalf of the Trustee and the Debtors' bankruptcy estate.

In early 2006, the Debtors were experiencing severe financial difficulties. Mr. Feeley had injured his back, and the couple had fallen behind on the payment of their mortgage, federal and state tax obligations, monthly utility bills, and revolving credit card debts as a result of the Debtor's lost income. On or around February 17, 2006, the Debtors received a notice from Option One Mortgage Corporation advising them that they were in default because of their failure to make their December, 2005 mortgage payment and subsequent payments in the total sum, including late charges, of $6,713.33.

In late February or early March of 2006, the Debtors met Hull, Costa and Reilly. According to Mr. Feeley, "[a] friend of my wife's recommended them and termed them as 'miracle workers.'" As a result, the Debtors were receptive when Costa contacted them, and they met several times with Costa, Hull, and Reilly at their home. Reilly was hospitalized around this time and did not attend all of the numerous meetings that took place to implement the "deal" that Costa orchestrated.

According to Costa, who was employed by Affordable Funding at the time and who obtained the Debtors' credit report, the Debtors were not qualified to refinance their home because of their poor credit. Thus, Costa proposed a transaction whereby the Debtors would convey their home to a third party, pay rent, reestablish credit and refinance the property at the expiration of a year's time. Mr. Feeley explained the transaction proposed by Hull and Costa:

Mr. Hull did a lot of the talking. I can't recall what. I wasn't sure what his

> role was. He's a personable guy. Mr. Costa would explain something, and Mr. Hull would explain what he meant, whatever, and it was again a repetition of what he said on the phone. . . . He said they have this fellow [Reilly] they've worked with in the past and that they've done this many times, and that this fellow had excellent credit and would buy the house from us and we would pay him $18,000, to which I said, "You said $15,000," and he said, "I misspoke."

While admitting that he understood that a fee would be payable to the person who was going to buy the property, Mr. Feeley added:

> They said we would realize a year's rent would be in the bank [sic]. Mr. Costa said, "If you - - of course, if you went to Foxwoods and blew it, you know, you'd - - you'd be in trouble." I took that to mean that the money would be under our name. And he said, "You'd have a year's rent in the bank," and I said, "the only thing that I want, other than that, from this whole transaction is $10,000 to pay the IRS," because I had been speaking to the IRS and the [agent] had said, "See how you handle your 2005 [sic] and we'll talk about a payment plan." So that's the only thing that I said that I wanted from the transaction, other than what he committed to, which is a year's rent in the bank . . . .

The Debtors understood that the money for the year's rent and payment of the IRS would be available from the equity in the property. Although the Debtors hoped to close the transaction within a short period of time because they feared a foreclosure was imminent, the closing did not take place until March 29, 2006. A variety of issues delayed the closing, including the acquisition of appropriate insurance, an inspection of the septic system, and Reilly's hospitalization.

At the closing on March 29, 2006, Reilly purchased the property for $450,000 and obtained a $405,000 mortgage, which required monthly "rent" payments from the Debtors in the sum of approximately $3,100. The HUD-1 Settlement Statement used for the closing

5

was inaccurate in numerous respects. It reflected settlement charges paid by Reilly of $13,661.11, as well as other payments, including "City/town taxes 3/29/06 - 8/1/06" in the sum of $1,327.02 and a "Final Disposal Fee" in the sum of $33.84, leaving an amount due from Reilly of $465,021.97, less the amount of $417,100 "paid by/for borrower." Thus, the Settlement Statement reflected that Reilly made a cash payment of $47,921.97. In fact, Reilly contributed none of his personal funds, and the "Cash from Buyer" came from the Debtors.

As noted above, the gross amount due to the Debtors was $450,000 - - the sales price. On the HUD-1 Settlement Statement, several adjustments were made to that price for "Adjustments for items paid by seller," i.e., the Debtors. These items included the payment of "City/town taxes" of $1,327.02, and a disposal fee of $33.84, which resulted in a gross amount due to the Debtors of $451,360.86. From that sum, numerous additional deductions were reflected on the Settlement Statement, including payment of 1) an "excess deposit" ($100.00), 2) settlement charges ($3,759.00), 3) satisfaction of the existing Option One mortgage ($327,000.00), 4) tax liens ($16,500.00), 5) "Seller Paid Closing Cost Credit" ($12,000.00), 6) "City Taxes 11/1/05 - 5/1/06 ($2,996.46) and 7) a "Final Disposal Fee" (130.00), ostensibly leaving the Debtors with $88,875.40.

The Settlement Charges included an $8,100.00 loan origination fee payable to Affordable Funding, an appraisal fee of $100.00, a mortgage broker fee of $700.00 payable to Affordable Funding, as well as $898.20 in miscellaneous fees paid to New Century Mortgage, Reilly's lender. Other payments in connection with the loan included interest

from 3/29/06 through 4/1/06 in the sum of $302.91. Additionally, significant title charges were incurred and ostensibly paid by Reilly, including a closing fee, a title examination fee, and attorney's fees all payable to Slade Barrett Title Company in the amounts of $255.00, $325.00, and $600.00, respectively. Slade Barrett Title Company also was paid for title insurance ($1,975.00), a courier fee ($75.00), "MLC/Tax Information" ($55.00), and a survey fee ($75.00). The remaining fee included a $200.00 fee for recording the deed. On the Debtors' side of the Settlement Statement, the Statement reflects their payment of a total of $3,759.00 in closing costs.[2]

In reality, the Debtors did not receive $88,875.40 from the sale of the property; they received $2,953.43. At the closing, the Debtors signed a document captioned "Sellers [sic] Authority to Disburse Proceeds of Sale of 174 Warren Avenue, Seekonk, Ma," in which they requested checks, which were dated March 28, 2006, disbursed as follows:

| | | |
|---|---|---|
| 1) | Mary & Robert Feeley and John Reilly | $47,921.97 |
| 2) | Mary & Robert Feeley and John Reilly | $12,000.00 |
| 3) | Mary & Robert Feeley and Robert Costa | $ 6,000.00 |
| 4) | The Gunnery School | $ 2,000.00 |

---

[2] The settlement charges of $3,759.00 were comprised of $550.00 for a document preparation payable to Slade Barrett Title Company, $125.00 for a courier fee payable to Slade Barrett Title Company, $532.00 for the recordation of a release of the Option One mortgage, $2,052.00 for "State tax/stamps; Deed:; Mortgage" [sic], and $500.00 for a "Water escrow." The Court was presented with no information as to whether the charges were reasonable or customary. Moreover, the settlement charges, while indirectly benefitting the defendants as part of the transaction, were not paid directly to them.

5) Mary & Robert Feeley and John Reilly        $ 8,000.00

6) Mary & Robert Feeley                                       $ 2,953.43

The Debtors endorsed the checks in the sum of $47,921.97 and $12,000.00 to Reilly, and they endorsed a check in the sum of $6,000.00 to Costa, resulting in direct benefit to the defendants of $65,921.97. Additionally, Affordable Funding received a check in the sum of $8,800.00, not $8,100.00 as set forth on the Settlement Statement, at the closing.

Although the Debtors obtained only $2,953.43 in cash from the transaction, payments were made on their behalf which directly benefitted them, including the payment of their mortgage to Option One ($327,000.00), the payment of a tax lien ($16,409.47), the payment of real estate taxes ($1,669.44), the payment of a water bill from the Town of Seekonk ($463.29), the payment of the Gunnery School for their son's tuition ($2,000), and the payment of $18,000.00 to Reilly, which he used to purchase a certificate of deposit to facilitate the payment of his mortgage in the event the Debtors failed to pay him sufficient "rent," which Mr. Feeley testified was in the approximate amount of $3,100.00, to cover his monthly mortgage obligation to New Century Mortgage Company.[3] In addition, they were able to remain in their home, although they no longer owned it. Thus, of the $450,000 purchase price, the Debtor received funds of $368,495.63 in direct benefit and lost $81,504.37 in equity in their home. Reilly obtained the property subject to

---

[3] Neither the Trustee nor Reilly submitted evidence at trial as to what Reilly's monthly mortgage obligation was or what the Debtors paid him in "rent." In his post-trial brief, however, Reilly stated that the rent was $3,313.33 and that the Debtors failed to pay the rent for ten months after the expiration of the one-year lease.

a $405,000.00 mortgage. In addition, he obtained a total of $59,921.97 and Costa obtained $6,000.00 from the proceeds.

At the time the Debtors entered into the March 29, 2006 transaction, they were insolvent. The amount of their debts exceeded the value of their assets by a considerable margin, and their income was insufficient to satisfy their monthly mortgage and other obligations as they came due. Just prior to the March 29, 2006 closing, the Commonwealth of Massachusetts, Department of Revenue placed a tax lien on the property in the amount of $16,409.47. The Debtor testified as to the couple's financial distress, and the defendants submitted no evidence even hinting that the Debtors were solvent or were in a position to pay their debts as they came due. Indeed, the Debtors' circumstances were so dire that they were receptive to the foreclosure rescue transaction presented to them by Hull, Costa, and Reilly, who testified that he had engaged in similar transactions with Costa, who was a family friend.

At the conclusion of the one year period, Reilly attempted to contact the Debtors about "refinancing" the property. The Debtors, who no longer owned the property, were unable to "refinance" or otherwise borrow funds to purchase the property back from Reilly. Moreover, the Debtors' Chapter 7 case was pending at the time the lease expired.

**III. DISCUSSION**

    A. <u>Counts I and II</u>

Section 548 of the Bankruptcy Code provides in relevant part the following:

    (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in

>   property, . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily - - . . .
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > (ii)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . .

11 U.S.C. § 548(a)(1)(B). The burden of proving a constructively fraudulent transfer under section 548 is on the trustee. See Gouveia v. Cahillane (In re Cahillane), 408 B.R. 175, 188 (Bankr. N.D. Ind. 2009) (citing Frierdich v. Mottaz, 294 F.3d 864, 867 (7th Cir.2002)).

Under section 548(a)(1)(B), the trustee must prove the following elements: "(1) a transfer of the debtor's property or interest therein; (2) made within one year of the filing of the bankruptcy petition; (3) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (4) either (a) the debtor was insolvent when the transfer was made or was rendered insolvent thereby. . . ." In re Cahillane, 408 B.R. at 188-89 (citations omitted).[4] Additionally, the trustee must prove each element by a preponderance of the evidence. Id. at 189 (citing, *inter alia,* Frierdich v. Mottaz, 294 F.3d at 867). *See also* Tomsic v. Pitocchelli (In re Tri-Star Techs. Co., Inc.), 260 B.R. 319 (Bankr. D. Mass. 2001).

As noted by the Court in In re Tri-Star Techs. Co., Inc., "[s]ection 544(b) provides

---

[4] Alternatively, the trustee could establish that the debtor was engaged or about to become engaged in a business or a transaction for which its remaining property represented unreasonably small capital; or that the debtor intended to incur debts beyond its ability to repay them as they matured. See 11 U.S.C. § 548(a)(1)(B)(iii) and (iv).

another approach. It permits the estate representative to wear the mantel of any actual unsecured creditor who could have avoided a prepetition transfer under 'applicable [non-bankruptcy] law.'" 260 B.R. at 323-24. The applicable non-bankruptcy law in Massachusetts is the Uniform Fraudulent Transfer Act. See Mass. Gen. Laws ch. 109A, §6(a), which provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mass. Gen. Laws ch. 109A, § 6(a). Just as under section 548, the Trustee carries the burden of proving each element by a preponderance of the evidence. In re Tri-Star Techs. Co., Inc., 260 B.R. at 324 (citing Ferrari v. Barclays Business Credit, Inc. ( In re Morse Tool, Inc.), 148 B.R. 97, 131 (Bankr. D. Mass. 1992)).

While section 6(a) of the UFTA and section 548(a)(1)(B) have critical differences in terms of the trustee's derivative standing under the UFTA and the applicable reach back period, those differences are not germane to a resolution of Counts I and II of the Trustee's complaint as the Debtors' Schedule F establishes that one actual unsecured creditor existed who could avoid the transfer and the Trustee commenced his action within two years of the March 29, 2006 transfer.

Under the Bankruptcy Code, a debtor is "insolvent" when "the sum of such entity's debts is greater than all of [the] entity's property, at a fair valuation . . . ." 11 U.S.C. 101(32).

The UFTA's definition is no different, except that a general failure by the debtor to pay its debts as they become due provides a basis for a presumption of insolvency. In re Tri-Star Techs. Co., Inc., 260 B.R. at 324-25 (citing Mass. Gen. Laws Ann. ch. 109A, § 3(a)-(b)). The Court finds based upon the Debtor's testimony and the Debtors' schedules of assets and liabilities that the Debtors were insolvent for purposes of both section 548(a)(1)(B) and UFTA section 6(a).

Although the Bankruptcy Code does not contain a definition of the term "reasonably equivalent value," it does define "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). According to the court in Tri-Star,

> [C]ourts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. The Court should "compare what was given with what was received." And, in making this determination, both direct and indirect benefits should be considered. It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed . . . will have significantly harmed . . . innocent creditors . . . ."

260 B.R. at 325-26 (citations omitted). According to the court in In re Adler, Coleman Clearing Corp., 247 B.R. 51 (Bankr. S.D.N.Y. 1999), aff'd, 263 B.R. 406 (S.D.N.Y. 2001), "[o]utside of the foreclosure context, reasonably equivalent value means something similar to fair market value." 247 B.R. at 106 (citing, inter alia, BFP v. Resolution Trust Corp., 511 U.S. 531, 545 (1994)). The court in Helms v. Roti (In re Roti), 271 B.R. 281 (Bankr. N.D. Ill.

12

Case 07-01201   Doc 194   Filed 04/13/10   Entered 04/13/10 14:06:46   Desc Main
Document      Page 13 of 17

2002), *aff'd*, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003), stated:

> Determination of reasonably equivalent value under § 548(a)(1)(B) is a two-step process. The Court must first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave. The second inquiry, whether what the debtor gave up was reasonably equivalent to what he received, is more difficult.

271 B.R. at 294-95. The court added: "The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee." Id. at 295 (citations omitted).

The Debtors transferred their property, which had a fair market value of $450,000, to Reilly for $368,495.63. Not only did Reilly obtain the down payment from the Debtors' equity, he received a substantial fee in the sum of $12,000.00 from that equity as well. Additionally, for putting the "deal" together, Costa received $6,000.00, and his employer Affordable Funding received $8,800.00. Thus, the Debtors' substantial equity, which could have been shielded from their creditors through a properly declared homestead or distributed to creditors, was stripped through a transaction involving the defendants which was not arm's length. The HUD-1 Settlement Statement, and in particular its inaccuracies, is indicative of the intention of Costa, Hull and Affordable Funding to obfuscate the lack of benefit to the Debtors. Additionally, after the transaction, the Debtors authorized disbursements for which checks, dated March 28, 2006, had been prepared in advance, to Reilly and Costa. Although Reilly was not a sophisticated lender and did not evince an

intention to harm the Debtors, he did not question the propriety of acquiring the property with no money down and receipt of the down payment, as well as a payment of $12,000, from the Debtors' equity.

Having found that the Trustee is entitled to avoid the transaction, section 550 permits the trustee to recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from "the initial transferee of such transfer [Reilly] or the entity for whose benefit such transfer was made [the remaining defendants]." 11 U.S.C. § 550(a)(1). In his Amended Complaint, the Trustee did not specify which alternative he sought, but in his Memorandum, the Trustee clarified that he is seeking the value of the property transferred, namely the Debtors' equity which equaled $81,504.37 on March 29, 2006.

B. Count III

To succeed on a claim for intentional misrepresentation, the Trustee must establish that the defendants "'made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'" Barrett Assocs., Inc. v. Aronson, 346 Mass. 150, 152 (1963) (citing Kilroy v. Barron, 326 Mass. 464, 465 1950)). *See also* Damon v. Sun Co., Inc., 87 F.3d 1467, 1471-72 (1st Cir. 1996).

The Court finds that the Trustee failed to sustain his burden of proof with respect to his claim for intentional misrepresentation. In particular, he failed to present evidence as to the Debtors' reliance on the representations made by Reilly and Costa. The Debtor

14

did not testify that he actually believed that he could "refinance" property the couple no longer owned, particularly while the Chapter 7 case was pending when the lease expired. Additionally, the Trustee did not address Count III in his Memorandum, a decision which the Court construes as an abandonment of that count against Reilly and Costa.

C. Count IV

Through Count IV of his Amended Complaint, the Trustee seeks damages for violation of Mass. Gen. Laws ch. 93A, §§ 2(a) and 9.  In his Amended Complaint, at paragraph 42, he alleged that he served a demand letter on the defendants at the same time as he served the summons and original complaint, which did not contain a count under ch. 93A.  Both Reilly and Costa denied receipt of the demand letter in the answers to the Amended Complaint.  No mention was made of the demand letter in the Joint Pretrial Statement or at trial, and no copy was produced as an exhibit.

The court in Kerlinsky v. Fidelity & Deposit Co. of Md., 690 F.Supp. 112 (D. Mass. 1987), *aff'd*, 843 F.2d 1383 (1st Cir. 1988), succinctly summarized the law applicable to the Trustee's ch. 93A count, distinguishing between actions by the debtor and the trustee and claims under sections 9 and 11.  It stated:

> The Massachusetts Consumer Protection Act makes unlawful any, "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Mass. Gen. Laws ch. 93A § 2(a). There is no dispute that defendant was conducting trade or commerce. Sections 9 and 11 of ch. 93A provide private causes of action for violations of § 2, but for different classes of plaintiffs. A plaintiff under § 9 is, "[a]ny person, other than a person entitled to bring action under section eleven of this chapter . . . ." A plaintiff under § 11 is, "[a]ny person who engages in the conduct of any trade or commerce. . . ." All that is required for a plaintiff to fall within the ambit of § 11 is some

15

>transaction in a business context. Plaintiff trustee argues that because he, an individual, brought this action, § 9 is the appropriate jurisdictional statute. That position is untenable. Plaintiff is simply proxy for the bankrupt, and this action clearly arose within the context of the underlying business contract between bankrupt and defendant's principal . . . . Section 11, and not § 9, should be applied in this case.

690 F.Supp. at 1117 (citation omitted). If section 9 applies, which the Trustee has alleged that it does, section 9(3) of Mass. Gen. Laws ch. 93A requires that a demand letter be mailed at least 30 days prior to commencing an action. In Dean v. Compass Receivables Mgmt. Corp., 148 F.Supp.2d, 116 (D. Mass. 2001), the court stated: "Attachment of the Demand Letter to the complaint thus serves as proof of compliance with that section." Id. at 117-18. *See* Spring v. Geriatric Authority of Holyoke, 394 Mass. 274, 287 (1985) (existence of demand letter must be alleged and proved). "An adequate demand letter is a jurisdictional prerequisite to any claim brought under ch. 93A by a consumer plaintiff." Manning v. State Farm Ins. Co., 1997 Mass. App. Div. 184, 1997 WL 672056 at *2 (Mass. App. Div. Oct. 24, 1997) (citing Thorpe v. Mutual of Omaha Insurance Co., 984 F.2d 541, 544 (1st Cir. 1993)). *See also* Rodi v. Southern New England School of Law, 389 F3d. 5, 19 (1st Cir. 2004) (quoting Entrialgo v. Twin City Dodge, Inc., 368 Mass. 812, 812 (1975)); Kerlinsky, 690 F.Supp. at 1117.

In view of the foregoing, the Court finds that the Trustee has failed in his burden of proof. He did not attach the demand letter to either his original or Amended Complaint, and, in view of the denials of receipt of the letter by Reilly and Costa, this Court cannot find that the letter was either sent or adequate as required by ch. 93A.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter judgment against Reilly and Costa, jointly and severally, in the amount of $81,504.37 on Counts I and II and in favor of Reilly and Costa and against the Trustee on Counts III and IV. In view of the defaults entered against Affordable Funding and Hull, the Court shall enter judgment against them, jointly and severally, with Reilly and Costa on Counts I, and II and in the amount of $81,504.37 on Count III. The Court also shall award the Trustee treble damages with respect to Count IV and thus shall enter judgment against Affordable Funding and Hull in the amount of $244,513.11 on Count IV.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: April 13, 2010
cc: Stephen M. Sheehy, Esq., Raymond Kohlman, Esq., Richard Costa, Affordable Funding Mortgage Corp.